May it please the court, my name is Capaldo Bonnequist and I represent the plaintiff appellate in this case, RainMakers Partners. You have of course quickly noted that my voice is rather harsh. My wife says I sound like Bugs Bunny. I apologize for that. I'm going to be sipping a lot of water through my presentation. I apologize as well. I'm going to focus my before the lower court on the first motion for summary judgment, which is whether the agreement required RainMakers to provide services to be entitled to a fee on an investment by an introduced investor, which here is Northwood. And I'm going to make three points. First, that the contract did not require RainMakers to provide services to be entitled to a fee. Second, that NewSpring's Rule 56.1 statement does not support the lower court's decision. And third, that RainMakers did in fact provide services. With respect to the interpretation of the contract terms, NewSpring's argument is that RainMakers didn't satisfy Subdivision A of Section 3, which speaks of, quote, initiating contact with introduced investors, unquote. But contrary to NewSpring's argument, the contract didn't require RainMakers to do so to be entitled to a placement fee. The contract anticipated that RainMakers would act both as a consultant, providing advisory services, and as a broker, introducing potential investors. It further provided two categories of compensation, a retainer fee for the consultant services and a placement fee for the brokerage services. I submit that this is a rather obvious interpretation of the contract. And if this court accepts it, then the issue of whether RainMakers provided advisory services is irrelevant to the question of whether it is entitled to a placement fee. I mean, I think your argument boils down to, or at least one of your arguments, is there are these provisions that say what compensation your client is entitled to, and there are these provisions that say what your client is required to do, and there is nothing that says you have to do the things that you have to do in order to get the compensation. That's not literally linked. Is that the argument? That's correct. In order to get the placement fee compensation. And I take it, I mean, you would agree that it's a normal expectation that if the contract says I will do this and you will do that, that those things are linked. Isn't that not a reasonable interpretation? And maybe you would say that's not so obvious and conclusive an inference that it could be the subject of summary judgment, that there's some ambiguity. But would you agree that at least that is a reasonable interpretation of a contract that says I'm going to do this and you're going to do that, that they're linked? If you don't do your part, I don't have to do my part. Depending on the contract language, of course. But here the contract language is, what is it that RainMakers does, it provides advisory services, it's $30,000. It's entitled to a placement fee if it makes a placement, and it's entitled to 2%. That's how they're linked. The advisory services aspect is not linked. I'm not worried about the advisory services at all. I'm worried about what's in paragraph three. And I take it you're saying one thing that we know that your client did was he did 3A. He initiated contact. And I take it you're reading that to mean he initiates the contact. He calls up the people on his list, right? But then there's also B, which involves basically, to take it broadly, introducing the person you've initiated contact with to NSH so that you will then facilitate discussions by coordinating and participating in conference calls and or meetings. That did not happen, right? Well, there's two aspects. To answer your question quickly, that did not happen. However, the only issue raised before the lower court by Nussbaum was 3A, not 3B. And also, as we point out in our main brief, whether or not a particular service is required under the circumstances depends upon how the whole thing evolves. So if, for instance, Rainmakers were to make one telephone call and the other side were to say, great, happy with it, I'm going to do it, I don't need to talk to you anymore, Rainmakers is entitled to this issue. Yeah, but what if they say, no, we're not that interested, see you later? Or what if they say, well, we're interested, but we need more information and there's no follow-up? Would not 3B then come into play? 3B could very well come into play, but as I said, that issue wasn't raised before the lower court. But yeah, you're correct, that depending upon what actually happens in the situation, 3B, 3C could come into play. Well, 3C is interesting because 3C says, at least for half of it, that Rainmakers only has to participate in such negotiations if requested to do so. But that seems to me to cast a light on A, B, and the first half of C, because those are not limited by if Rainmakers is specifically requested to do so. These are all things that Rainmakers apparently shall provide. Well, take a look then at 3B, facilitating discussions, participating in conference calls and or meetings between the parties. What if the parties didn't have any conference calls or meetings? And what if those conference calls and meetings were not necessary under the circumstances? Right, but that's not our situation, right? I mean, Iris, that would arise if, as you said, in the particular circumstances, Rainmakers contacted one of its contacts and said, here's an opportunity for you. And they said, great, here's a check, give it to your principal, and we're in. In that case, you wouldn't get to B or C. But the question is if there is, for example, no follow-up on the expression of interest, or if there is basically a rejection by, let's hypothetically say, the only person that Rainmakers called from the list, and that person says, no, we're not interested, but then later they make a contribution. Your argument is that Rainmakers would still be entitled to the participation fee of 2%. Is that right? Yes, that's correct. Now, let's look at this hypothetical. So Rainmakers does what it did here, which is it talks about the deal, it arranges a conference call, and then we're getting hypothetical now. They say, no, I'm interested. Rainmakers drops them from its list of people it's working with. And a month later, they go straight to Newsweek and say, we've changed our mind. We've changed our mind. Rainmakers is then, I would say, at least it's a reasonable position. Rainmakers isn't entitled to a fee. I think I understand the argument. Thank you. Counsel, let me ask you, you have an argument that you were deprived of discovery before summary judgment was granted on the second and third counts, the second summary judgment ruling? That's correct. All right. But didn't you agree in the district court that discovery would be stayed and no discovery would be conducted pending the resolution of those motions? I was confused why you agreed to that below, and now you contest it here. I agreed to it below, as the other side, because we both understood if I were to, at least it was my understanding, I think it was my adversary's understanding, that if we were to seek discovery while the motion was pending, the court would stay. And by that time, the scheduling order had already expired. So that's what is a further aspect to the complication here, which is due to the long time that this motion, that the first motion for summary judge was pending before the lower court. All of the discovery aspects were expired. But in November, you said to the district court, defendants are going to file a summary judgment motion in January. And we agree, even though we all understand that this summary judgment motion could end the case, we agree that we're not going to pursue any discovery while we're waiting for that briefing schedule to be done. I just don't understand how you can now contest that you weren't given discovery when you specifically, not only did you not ask for an extension of the scheduling order or ask for discovery at that November 2022 conference, you affirmatively said, we're good, Judge. Carry on with the summary judgment until you saw the motion, at which point you brought the 50-60 claim. But I'm confused. Until you see, I'm kind of in a difficult position here because the scheduling order has expired. They're now saying we're going to seek summary judgment on counts two and three. I don't know what's going to be in that motion. I don't know how to respond.  Now I do have to interrupt. The discovery period had already expired when this discussion is being held. That's what you're telling me, right? That's how I understood it. That's correct, isn't it? That's correct. Now, in my courtroom, when I was a district judge, if somebody said, you know, the discovery period has expired, we're now going to have a summary judgment motion. And the argument is, oh, wait, there's this guy that we served with a deposition notice months ago. And he never showed up. So now I want to depose that person. My first response would be, why didn't you come to me then, during the period of discovery, before discovery expired, and ask to enforce that deposition notice? It's too late now. You can't come when we're sitting here talking about summary judgment and say, well, I should have made a motion to compel four months ago. It seems to me, at least I'm very tempted to say, it would not be an abusive discretion on the part of the district judge to say, let's just go and do the summary judgment motion now. It's too late. Because that's the way I typically exercise my discretion in that period. Now, maybe that was abusive or wrong. But what's wrong with that logic? If the discovery period has expired when we're having this discussion, why are we even talking about a stay of discovery? We're talking about time to move on. You should have come to me months ago, if there was somebody you wanted to depose and they didn't show up. Is that not what happened here? Well, Judge Lewis, I can't speak on behalf of my predecessor and why my predecessor proceeded in the way he did. But my expectation is, as I said, if before the motion is even filed, if we'd gone to Judge Ramos, and I said, I want to take some discovery here, and Judge Ramos would have said, well, no, let's decide the motion first. And if it turns out there's anything left, then we can go to discovery. There's no point in wasting resources at this time. Well, I mean, that would suggest that he was open to deciding potentially multiple summary judgment motions, which at least in my time in the district court, that wasn't my favorite thing. Can I ask, I have a jurisdiction question, unless my colleagues have another merits question. Following our order, I think the parties agree that New Spring Holdings is not a diverse party. So let me ask about their dispensability. Is it right that the payment was to be invoiced to New Spring Holdings? Is that what, well, why did you sue them? I suppose I'll start with that. Well, again, I cannot speak on behalf of my predecessor. I mean, you sort of have to, whether you want to or not. Well, the position I'm taking, and I think it's the correct position, as well as the position taken by my adversary, is that New Spring Holdings shouldn't have been sued. Am I right that the contract requires that invoices for these payments be direct? They're not a signatory, sure, but that invoices for the payments under the contract have to be directed, have to be in the name of New Spring Holdings? Let me take a quick look. Well, let's assume that doesn't make them a party to the contract. It makes them a facilitator of payment. Yeah. I mean, I guess whether they would be obligated to pay, though not a signatory, might go to dispensability. Well, I don't see how they could be obligated to pay if they are not a signatory and they have, as Judge Lentz was talking about, no obligations under the contract. So you can send the invoice anywhere. You can send it to the accountants, for instance. Sometimes that happens. Send the invoice to our accountants, they'll take a look at it. That doesn't mean that the accountants are obligated on the invoice. Can I ask a different jurisdictional question, which is that you all stipulated in the supplemental briefing that the parties, the other parties, other than the one we've just been talking about, are diverse because the members of the LLCs are residents of different states. We have case law saying that's not a sufficient allegation of diversity of citizenship because residence is not the same thing as domicile. In other words, if a young lawyer goes to Washington from New York where he's always lived to take up a clerkship, during that year he's resident in the District of Columbia, but if he intends to return to take up a job with a New York law firm at the end of the clerkship, he's still a citizen of New York. So residence and domicile are different. Now, I take it usually people are domiciled where they're resident. That's the most common situation. Is this a thing? Is this a problem in this case? Because we do have case law saying that a complaint that says I'm a resident of New York and the defendant is a resident of New Jersey doesn't do it to allege diversity of citizenship. You are correct, Judge. But it is my understanding that all the members of all of the parties, other than holdings, are domiciled in different states, which is to say none of the members of the defendants are citizens of California. And my adversary could correct me if I'm wrong. Okay. Well, we'll ask him and maybe we'll have an effective stipulation that will solve that problem. So I thank you. All right. Thank you. You have a minute reserved for rebuttal, Mr. Bonaclis. We'll hear from Mr. Leary. Good morning, Your Honors. My name is Paul Leary on behalf of Iapoli Rainmakers. As you know, this is a dispute over a placement fee that the appellant never earned. The dispute dates back to the advisory agreement, a non-exclusive agreement back in 2019, of which Rainmakers had explicit services that they had to provide. It's clear, and as the district court found on a separate partial summary judgment motion, that there were enumerated services to be earned, which actually makes sense given the objective of this agreement. And if you actually look at the addendum to the agreement, my client agreed to indemnify Rainmakers in connection with the services they provide if they should create liability. So we haven't yet in the indemnity agreement that we are going to actually indemnify them for what? The services you provide, enumerated in the contract, if there should be liability that is created from that. They never facilitated it. And when this came in, Your Honor, the first thing I thought when I talked to my client was, well, let's go to the source. They're claiming they are entitled to $2.4 million by a company called Northleaf. We actually did the affirmative discovery in this case. We went and got affidavits from all the entities to ask a simple question. In any way did Rainmakers play a role in facilitating phone calls, introduction, anything that led to Project Tiger, which was a recapitalization project initiated by a broker called Triago. Triago went out and got about 20 to 30 potential investors. It narrowed it down to about eight and ultimately a company called Northleaf invested. Rainmakers found out about this almost a year later. So a year later, they see it in the paper and say, whoa, whoa, I'm entitled to $2.4 million. They didn't provide any services for that. But we went to the source, all the entities. Rainmakers did no discovery on that. And importantly, as to another count they had, which was confidentiality and that we may have conveyed confidentiality, we subpoenaed all of Rainmakers' investors. We went to them, give us any emails, communications, Salesforce that suggests that Rainmakers and NewSpring communicated with you on Project Tiger. Nothing. Nothing has come out in this case to suggest that they were in any way related to this separate project. But there was some evidence, was there not, that they were contacted with respect to the original investment opportunity in the fund, right? Sure. In the first one, the fund was a health care fund, Your Honor. And they were connected. And ultimately, I believe, three interested investors had an interest. And why? Because Rainmakers fulfilled their obligation under the agreement to do the services. So we have an example of three times, while it just heard that they didn't have to do anything, they actually did. JP Morgan, NewSecond, and a third one. And unfortunately, they just ultimately never came to fruition. But the addendum to the agreement says that the parties agree that the definition of fund is extended to any investment vehicle or co-investments managed or offered by NewSpring Capital, LLC, which will be subject to a placement fee. Correct. I understand your argument that the sort of legislative history or the drafting history of this shows that it was intended to cover a specific investment by NewSecond or somebody, right? Where they weren't interested in the fund, but they were interested in something else. At that time, they later turned out not to be interested, which would consummate a transaction. But NewSpring, which was contacted with respect to the fund, then turns up later interested in what is also a vehicle or co-investment managed or offered by NewSpring Capital. Would you agree that that language covers the Project Tiger? No, I respectfully disagree for two other reasons. Beyond the intent, and even Rainmaker said it's just for NewSecond. Forget about that. We know that, in fact, the entire fund closed out though. It closed out well before Project Tiger. But most importantly, Your Honor, the addendum maintained that the services still need to be rendered in connection with the subject deal. And to the extent that maybe Rainmakers had a call with Northleaf about the health care fund, never came to fruition. There's no dispute. But as to then a recapitalization project six months after the fund closed by a different broker, in no way should be read as a service rendered. It would make it actually. And where does the addendum, you mentioned two things. You mentioned a word indemnify and you mentioned a requirement of the services. And I just, on a quick glance, I'm not seeing that in the addendum. Not in the addendum. In the advisory agreement, Your Honor, there's a Schedule A, and it's in the second paragraph, and Newspring agreed to indemnify Rainmakers in connection with any claims, suits, liabilities arising in connection with Rainmakers' services. Okay. Now I see what you're talking about. Yeah. Sorry if I said indemnify. No, that's all right. I may, I probably misunderstood or. Okay. Okay. So, again, to the extent there may have been some discussions with a company called Northleaf, the most important thing is, unlike Rainmakers, we went to Northleaf and said we just need to confirm. Because as I told my client, if Northleaf says they did this deal, even though Chicago bought them in, because of Rainmakers, you might owe the money. There was no evidence whatsoever that Northleaf, as from their CEO, said that there was any involvement by Rainmakers. They were contacted by Triago. They were one of 10 finalists for Project Tiger to basically add money to an outgoing investor in a different fund. They were just recapitalizing. And they put up money. But ultimately, there was no involvement whatsoever from Rainmakers in that deal. And so, again, I think it's a very important transaction. Counsel, can you use some of your time to respond to our questions about diversity? Sure. I have your supplemental brief here, and it does focus on the word residency, which, as we've all pointed out, is not sufficient. Right. So the residency, whether, you know, residency and domicile, I can tell you as to the dispensable  It's a holding company, and they have individuals. I think it's stipulated they're going to be dismissed. Yes. But I'm talking about the other LLCs that are not being dismissed. Your brief doesn't tell us what kinds of entities, for example, the members are. So an LLC can have members that are other members or other LLCs or corporations or individuals. And you just sort of say, trust us, everybody who's a member is a resident of? Pennsylvania. Pennsylvania. Yes. So we're missing, we've had two problems there from my perspective. One is the residency problem that my colleagues have raised, and the other is not telling us what kinds of entities are the members so that we can determine which set of rules to apply for citizenship. Sure. I believe they are all individual entities that reside in Pennsylvania. So whether that's residing, excuse me, or domicile, they all live in Pennsylvania. None of them are connected to California. So for those entities that remain in the case, the LLCs, we identified them simply, I mean, maybe we can focus on those as opposed to the entity that the court had a question on with respect to holdings. We didn't ask about... I asked about dispensability, not about citizenship. Okay. The citizenship question goes to the parties that remain in the case. Right. Your representation is that the briefing, you meant to say domicile. Yes, Your Honor. Yes, because they're all individuals that reside domiciled. You said individual entities. You mean individuals. Yes. Human individuals. Human individuals. I'm sorry, Your Honor. Yes, human individuals. All of whom are citizens, domiciled and in citizens of Pennsylvania. Correct. Yes. And for the indispensability question, though not a party to the contract, is holdings, would... Are they obligated to pay under the contract? No, they would not be holding. It would be the new NSH3 and or capital that would be obligated to pay. And I believe actually did pay the $30,000 retainer fee. All right. With that, unless there's any questions, I thank you, Your Honor. Thank you. Mr. Fennecush, you do have a minute. Thank you, Your Honor. With respect to Project Tiger, there is no dispute that Rainmakers did not provide services. However, Rainmakers' contract was exclusive with respect to the introduced investors and is settled law in New York. And I think in most cases, if you are an exclusive broker, you get the fee of a subsequent transaction, whether you did anything or not. With respect to the second question, the question of confidentiality in of paragraph 8... I'm sorry. What's the basis for the assertion that it's an exclusive broker? We set forth our brief at length, Your Honor. We brought these people to Northleaf, to New Spring, because they were known to us. New Spring needed our assistance. And there is... And the contract was formulated in such a way that exclusivity is inherent to it. Now, with respect, if I may... Go ahead. I'm really out of time here. With respect to confidentiality and second or third claims, I just want to point out again to the court, the last sentence of paragraph 8B concerning confidentiality, quote, in particular, NSH shall not introduce introduced investors to third parties, whether such introduction is for profit or not. That statement is highlighted in our papers, and the defendants do not even address it. They don't address it because it's violated. The facts... Could you just identify, is there any evidence at all that the defendants shared your list of contacts with anybody? Uh, no, there is not, Your Honor. So what is the confidentiality claim here? I thought there was a claim... I thought you were addressing your claim that there's some kind of trade secret here that they violated. The trade secret situation arises as a result of New Spring reaching out to introduce investors on other deals. But are you saying that they could never contact J.P. Morgan about a deal because J.P. Morgan was on your list? Yes, I am. Okay, that's interesting. But I thought the whole point of why this was so confidential and secret was something that they never found out, which is who is your guy at J.P. Morgan? That it wasn't that you had some unique ability to deal with J.P. Morgan. It's that your client had specific contacts who would be useful in facilitating that deal. They never knew, as far as I understand, who that contact was. If five years later, or two years later, or six months later, in connection with Project Tiger, say, they had an employee who knew somebody else at J.P. Morgan. They still couldn't contact him because J.P. Morgan is on your list? That it's a great secret that J.P. Morgan can invest in things? Actually, the contract provides... The way the deal was structured, we know people at J.P. Morgan. They don't know. But we don't keep their names secret from Newsman. We introduce them to Newsman. Obviously, they have to get to know these people. They have to get to know each other. They have to feel comfortable together in order to do a deal. Is it your contention that the people at... All these companies have these weird names that I have trouble keeping straight. Northleaf, is that who we're talking about? That the people at Northleaf that did this deal are the very people that... I mean, they aren't the very people that your client contacted. Because we've got the testimony from the person at Northleaf who made the arrangements with them saying, yeah, I sort of surveyed my company and found the people who talked to Rainmakers about the other deal. They were completely different people. He had to look them up to find out that there even had been any contact between Northleaf and the defendants. And it doesn't seem at all that this relates to the people that your client had connections to. I understand the importance of those connections, but that has nothing to do with this deal. That is the exact purpose of the last sentence in section 8B. In particular, NSH shall not introduce investors to third parties. That's a very, very broad statement. And I suppose you could say... NSH did not introduce one of the investors to third parties. They talked to them themselves after some other broker brought them in. Why is that? Well, here, the third party here is the party that has received the fund. Okay. I got it, I guess. All right. Thank you, Mr. Brennequist. Let me just ask, Mr. Leary, if you would put in a submission correcting your earlier submission, make sure that we have something we can cite to after confirming that the members are domiciled somewhere other than California. I will, Your Honor. Thank you. Thank you. Within a week? A week is fine. Within a week. Thank you.